UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

ZULFIQAR ALI, M.D.,

    Plaintiff,

v.

CALUMET MEDICAL CENTER, INC.,
AFFINITY HEALTH SYSTEM, and
AFFINITY MEDICAL GROUP,

    Defendants.

Case No.: _____

---

## COMPLAINT

---

NOW COMES Plaintiff Zulfiqar Ali, M.D. ("Plaintiff" or "Ali"), by his attorneys, Cade Law LLC, files this complaint against defendants as follows:

1. This is an action for racial discrimination in violation of 42 U.S.C. § 1981. Plaintiff seeks declaratory relief, and compensatory and punitive damages in an amount to be proven at trial. This also is an action for breach of contract, invasion of privacy and retaliation.

2. Zulfiqar Ali, M.D. is a resident of the State of Wisconsin, with his home address of 1601 N Farwell Avenue, # 319, Milwaukee, WI 53202, Milwaukee, WI 53211. Dr. Ali is a licensed medical doctor in the State of Wisconsin. Dr. Ali is a Pakistani national, and a resident-alien of the United States. For purposes of this Complaint, Dr. Ali is non-white racial minority.

3. Defendant Calumet Medical Center, Inc. ("CMC") is a Wisconsin corporation operating a hospital located at 614 Memorial drive, Chilton, WI 53014.

Upon information and belief, CMC is owned and operated by Defendant Affinity Health Systems. The registered agent for CMC is Timothy Richman, 614 Memorial Drive, Chilton, WI 53014.

4. Affinity Health System ("Affinity"), upon information and belief, is a foreign non-stock corporation operating a regional health network in Wisconsin with its principal place of business at 1570 Midway Place, Menasha, WI 54952. The registered agent for Affinity is Jeff Badger, 1570 Midway Place, Menasha, WI 54952.

5. Defendant Affinity Medical Group ("AMG"), upon information and belief, is a Wisconsin network of primary care and specialty doctors. AMG has as one of its principal address 618 Memorial Drive, Chilton, WI 53014. AMG operates the Chilton Medical center Clinic ("Clinic"). Upon information and belief, Affinity is the owner and operator of AMG.

6. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1331 and 1343. This action arises, among other reasons, under the Fourteenth Amendment to the United States Constitution, and under certain federal laws, including 42 U.S.C. § 1981.

7. Venue is appropriate in the eastern District of Wisconsin, and more specifically, in the Green Bay Division of the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1391, as all of the events giving rise to this claim occurred in the Eastern District of Wisconsin, and more specifically in Chilton, Wisconsin, which is contained in the Green Bay Division.

## FACTS

8. Dr. Ali began work at CMC on or about October 1, 2009. Acute Care, Inc. initially employed Dr. Ali when he began working at CMC. Subsequently, Dr. Ali was offered employment with AMG and CMC via contract on or about August 30, 2010.

### THE DEATH OF PATIENT 1

9. Dr. Ali was the emergency room physician on duty at CMC on the evening of March 19, 2011 when an injured motor vehicle driver ("Patient 1"), who was involved in a single vehicle accident that caused her vehicle to go into a body of water, was brought into the emergency room. Patient 1 subsequently died.

10. While in the Emergency Room at CMC, Patient 1 was treated by Dr. Ali and the other emergency room staff members of CMC.

11. Dr. Ali intubated Patient 1 while she was in the ER. After he intubated, one of the ambulance technicians, Mark Price, who was not directly involved with transporting Patient 1 to CMC or with her care, complained that Dr. Ali had intubated Patient 1 incorrectly.

12. Dr. Ali disagreed with this assessment by Technician Price, but did order x-rays to confirm the placement of the tube and whether it was in Patient 1's esophagus as required.

13. The x-rays verified that the tube was in Patient 1's esophagus.

14. Despite confirmation of the placement of the tube and with Dr. Ali out of the room, Technician Price intubated Patient 1 a second time without removing the first tube Dr. Ali had used.

15. Patient 1 "coded" less than 10 minutes after Technician Price intubated her a second time, and as a result, she was transferred to a higher level of care via helicopter to Theda Clark Medical Center in Appleton, Wisconsin.

16. Patient 1 died within seventy-two hours of her arrival to CMC.

17. On March 20, 2011, Dr. Ali prepared his dictation of the series of events as to what transpired. He also reviewed additional x-rays taken, and at this time, discovered the second tube in Patient 1 that he had not authorized.

18. Dr. Ali did inform the leadership of CMC what had occurred with the second tube and the actions of Technician Price, but upon information and belief, no action was taken.

19. Dr. Ali subsequently was notified on April 23, 2011 of his removal from the emergency room roster at CMC. This suspension was done even though CMC and AMG had not yet completed the review of what had transpired on March 19, 2011. Dr. Ali was also not allowed to see his own patients that were admitted to the floor, despite the fact that his medical privileges were still active.

20. In addition, CMC convened a preliminary Review Committee ("PRC") to investigate the cause of Patient 1's death, and who bore responsibility, if any.

21. Dr. Ali was informed on or about June 7, 2011 that the PRC would be formed and an inquiry was made as to whether or not he would present his version of the events of March 19, 2011. On or about July 7, 2011, Dr. Ali received an email from Dr. Griger, CEO of AMG, about the PRC meeting on July 19, 2011 to discuss Patient 1's death. Dr. Ali indicated that he wanted the complete record that the committee was to consider.

22. On July 11, 2011, Drs. Griger and Gene Tipler, Chief of Staff at CMC, and John Chastain, Director of Clinic Operations at CMC, came to see Dr. Ali while he was at CMC and terminated Dr. Ali. A termination letter was provided to Dr. Ali at this point in time.

23. Interestingly, only a few weeks earlier in June 2011, Dr. Ali had been provided the appropriate paperwork to enter into the next year's contract with Affinity.

24. At the July 19, 2011 PRC meeting, Dr. Ali inquired about the PRC process and time frame to complete the process. Dr. Griger indicated that the process may take at least another month. Dr. Ali questioned why it was taking so long (since it already had been four months), and that he believed, per Affinity bylaws, the process was to have been completed within 30 days. Dr. Griger then indicated that Dr. Ali wanted to push the meeting back, but Dr. Ali disagreed with this statement. No writing exists that indicates that Dr. Ali agreed to any extension for completion of the PRC process.

25. Subsequent to the July 19, 2011 PRC meeting, Dr. Ali received a letter indicating that the PRC had decided that it was not going to take any action against Dr. Ali. He also was asked if he stilled wanted to appear before the MEC on August 1, 2011. At no point in time was Dr. Ali provided with the "findings" of the PRC.

26. Dr. Ali did appear before the MEC on August 1, 2011 and presented his side of the story with regards to the death of Patient 1. Subsequently, Dr. Ali received a letter from the MEC in which he was informed that the MEC agreed that the tube Dr. Ali inserted into Patient 1 was in the esophagus.

**DR. ALI'S EMPLOYMENT AGREEMENT**

27. When Dr. Ali joined the AMG staff, Dr. Chastain told Dr. Ali that all newly hired providers were to be paid $20,000 for medical loan forgiveness, and also would receive a bonus of $10,000. Dr. Ali did inquire about the amounts offered, especially because he knew that Theda Clark offered a $58,000 bonus and $100,000 for loan forgiveness.

28. When he questioned the difference, he was told by Dr. Chastain that he [Dr. Ali] was being given the maximum allowed by AMG policy.

29. Dr. Ali subsequently learned that the loan forgiveness was supposed to be $100,000 and the sign on bonus was to be $50,000. No explanation was given as to why Dr. Ali received less money upon joining AMG then white providers.

30. In addition, when Dr. Ali joined AMG, he was informed that providers had to work approximately 4 ½ days per week as their office hours, plus see inpatients and do calls. Subsequently, he learned that other providers only had to work 4 full days, not 4 ½ days. No explanation was given to Dr. Ali why he was treated differently then the other white medical providers.

## DR. ALI'S COMPLAINTS ABOUT CONDITIONS AT CMC AND AMG

31. While at CMC and AMG, Dr. Ali complained of certain procedures used by Affinity. For example, Affinity began a new practice model called "Medical Home" in late 2010. See http://www.affinityhealth.org/object/affinity-medical-home.html. In theory, this new practice model was supposed to be more cost-effective.

32. Because of the new practice model, Affinity agreed to guarantee income for each medical provider for a two-year period.

33. Previously, medical providers were paid based on their relative value unit, a short-hand term for the value of the provider's care.

34. As a result of this new practice model, these medical providers would continue to send patients to Dr. Ali, despite the fact that the other providers had openings themselves to see their own patients.

35. Dr. Ali complained that this practice model resulted in certain perverse disincentives and inefficiencies, causing Dr. Ali to be completely booked and unable to establish his practice with his own patients. In order to accommodate Affinity, he offered to see these additional patients if the provider was not in the clinic or had a full schedule, but to no avail.

36. Dr. Ali noted that the problem with this new practice model is that acute patients were directed to come to the Clinic, as opposed to going to the Emergency Room. Dr. Ali again complained about this practice, in that it was very dangerous. He would have to see patients complaining of chest pains, syncope, etc. The end result is that Dr. Ali would have to send many of these patients to the emergency room, thereby delaying their treatment, especially if these patients presented to the clinic during late hours.

37. Another problem with the new practice model is that the providers did not have medical assistants ("MA") assigned to just one provider per shift. Instead, it was a pool assignment. So, as a result, if one MA brought the patient to the room, then left, Dr. Ali, or any other provider, would have to leave the patient's room, find another MA who was the least busy, explain the patient's issues, and necessary tests, etc. When the results were returned, those results might be relayed by a third MA. This caused a

fair amount of hassle, created friction with the staff, and resulted in numerous inefficiencies and requirement that Dr. Ali and the other providers re-issue the prior orders.

38. Despite numerous complaints that this new practice model was dangerous and inefficient, Dr. Ali informed CMC, AMG and Affinity's leadership that he could not and would not see any acute patients in the Clinic, as he did not want to bear responsibility for these patients. Despite he admonition against seeing these acute care patients, he was admonished and given written orders that he would have to see them as patients.

39. Dr. Ali also reported numerous problems he had with the staff tampering with medical records. For example, he often would perform physicals and fitness exams for commercial drivers and Boy Scout Chaperons. There were times when additional tests (and the subsequent results) were needed before Dr. Ali could sign off on the fitness of a particular individual. Thus, these individuals often were given temporary fitness certificates (usually good for approximately 3 months). Dr. Ali subsequently caught an MA tampering with a medical record for such a fitness exam. When he brought this to the attention of management of the Clinic, not action was taken against the MA.

40. Furthermore, Dr. Ali was pressured by the management of the Clinic to sign off on these fitness exams because they were just "boy scout chaperone exams", even if he had determined that the individual was not fit. For example, he was pressured to approve the fitness level of an individual, despite the fact that this person had an alcohol abuse problem, anger issues, etc.

41. Dr. Ali also became aware of potential discrepancies with the medical drug supplier for nursing home patients in Chilton. More specifically, the Shopko Pharmacy in Appleton, Wisconsin supplied the Chilton care Center, a nursing home in Chilton, which is owned by Affinity. On several occasions, Dr. Ali received fake or tampered with controlled-substance requests. These requests were sent to Dr. Ali for his signature even if the patient had been discharged from the nursing home, or in the case of one patient in particular, near death and not in need of the specific controlled substance. Dr. Ali suspected the Shopko Pharmacy and the Affinity staff of complicity/ and/or inefficiency, and alerted management of his concerns, but, upon information and belief, no action was ever taken.

42. Dr. Ali sent an email to Christine Griger, the CEO of AMG, to discuss these issues in December 2010. He subsequently met with Drs. Griger and Tipler on December 20, 2010 to discuss his grievances and other issues that had occurred while he was employed at CMC.

43. Approximately two weeks later, Tim Richman, CEO of CMC, came to Dr. Ali's office and said that Dr. Ali had lost the confidence of the leadership at AMG and would be fired. Mr. Richman then informed Dr. Ali that if AMG did terminate Dr. Ali's employment, Dr. Ali should request of AMG that it allow to work as employee of CMC, because Mr. Richman believed that he and Dr. Ali had very good communications with each other, Dr. Ali's patients were happy and CMC needed Dr. Ali's work.

44. In late February 2011, Dr. Ali contacted Dr. Tipler to inquire what the result of his complaints were from the December 2010 meeting with Drs. Griger and Tipler, but Dr. Tipler did not know.

45. On March 10, 2011, Dr. Ali received an email from Dr. Griger indicating that all of his alleged grievances had been taken care of and resolved, at least according to her staff.

46. However, none of Dr. Ali's grievance's had been taken care of, despite Dr. Griger's statement to the contrary.

## DR. TIPLER'S IMPERMISSIVE INQUIRY INTO DR. ALI'S MEDICAL CONDITION

47. Dr. Ali was seeing a psychiatrist prior to the death of Patient 1, but did see the psychiatrist several more times because of the death.

48. Dr. Tipler met with Dr. Ali on approximately June 30, 2011. At that meeting, Dr. Tipler discussed the fact that Dr. Ali was behind in his dictations, and was given a specific deadline to complete those dictations. In addition, Dr. Tipler specifically told Dr. Ali to "get psychiatric help" from someone at Affinity. Dr. Ali refused to get psychiatric help from Affinity psychiatrist because he already was seeing a psychiatrist in Milwaukee as a result of the death of Patient 1, but he refused to tell Dr. Tipler the name of the psychiatrist.

49. At the end of this June 30 meeting, Dr. Tipler asked Dr. Ali to sign a "corrective letter." The corrective letter allegedly indicated that Dr. Ali had received the letter but did not state that Dr. Ali agreed with the corrective nature of the letter.

50. Days later, Dr. Tipler returned to meet with Dr. Ali and again inquired about Dr. Ali seeing a psychiatrist. This time, Dr. Tipler specifically inquired about the name of Dr. Ali's psychiatrist. Dr. Ali told him that this was an invasion of privacy, pursuant to Affinity rules, and that if Dr. Ali's psychiatrist believed that Dr. Ali was unfit to practice, the psychiatrist was bound to notify the appropriate authorities.

10
Case 1:13-cv-00766-WCG   Filed 07/09/13   Page 10 of 16   Document 1

51. About two days later, Dr. Tipler again came to see Dr. Ali, and stated that he [Dr. Tipler] wanted to know if any "special arrangements" needed to be made for Dr. Ali. Dr. Tipler also said that he understood about privacy issues, but he [Dr. Tipler] was willing to discuss any issues Dr. Ali might have.

52. Again, about two days later, Dr. Tipler came to Dr. Ali a fourth time and told Dr. Ali that either Dr. Ali ask his psychiatrist to send Dr. Ali's psychiatric file to Dr. Tipler or Dr. Ali would have to be evaluated by 'our own' psychologist and he/she would send progress report to Dr. Tipler. Dr. Ali refused and told Dr. Tipler that he was being too invasive and harassing. Dr. Ali further explained that per employee health policy of Affinity, Dr. Ali's meetings and sessions with his psychiatrist were confidential. Moreover, upon information and belief, Affinity policy provides that if an employee did not want to be seen by any psychiatrist/psychologist from Affinity because of privacy concerns, then Affinity would pay the employee up to $5,000 for medical provider fees for psychiatric help from outside of the Affinity system.

53. 2 days later, Dr. Tipler returned a fifth time to speak with Dr. Ali, and this time, he brought a MANDATORY referral form to see an Affinity psychiatrist. Dr. Ali refused to sign this form, and specifically instructed Dr. Tipler that he was harassing Dr. Ali. Dr. Tipler left and indicated he would discuss with Affinity management to solve this issue of Dr. Ali not being willing to see a psychiatrist from Affinity.

54. Most of these meetings with Dr. Tipler occurred between June 30, 2011 and July 9, 2011.

55. Dr. Ali was offended by Dr. Tippler's constant harassment and inquiry into Dr. Ali's relationship with his own psychiatrist.

## FIRST CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1981)

56. Dr. Ali incorporates by reference the allegations contained in Paragraphs 1 thru 55 as if fully stated herein.

57. Dr. Ali is not white, but rather is a racial minority. Dr. Ali's ethnic characteristics are readily identifiable.

58. Dr. Ali's initial contract with CMC and AMG was different than that presented to other white medical providers.

59. Dr. Ali was terminated by CMC and AMG, for among other things, complaining about numerous issues while employed by CMC and AMG. Other white medical providers were not terminated for their complaints.

60. Dr. Ali also had a contract with CMC and AMG that was terminated improperly because of racial animus.

61. These actions against Dr. Ali were done with an intent to discriminate, as similarly-situated persons not within the same protected class as Dr. Ali were not discriminated against.

62. As a result of AMG and CMC's purposeful discrimination against Dr. Ali, he has suffered damages in an amount to be determined at trial. Dr. Ali also is entitled to monetary damages, compensatory damages, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, punitive damages, and injunctive relief to have his position with AMG and CMC restored.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

63. Dr. Ali incorporates by reference the allegations contained in Paragraphs 1 thru 62 as if fully stated herein.

64. Dr. Ali had a contract ("Contract") with AMG to provide physician services. The Contract was supported by adequate consideration.

65. That Contract was breached by AMG on or about July 11, 2011 when Dr. Ali was terminated.

66. AMG breached the Contract by terminating Dr. Ali after he complained about procedures and practices at CMC and AMG.

67. As a result of the breach of the Contract, Dr. Ali suffered damages in an amount to be determined, including, but not limited to, wages and benefits he would have earned but for his termination.

## THIRD CAUSE OF ACTION
### (Invasion of Privacy – Wis. Stat. § 995.50)

68. Dr. Ali incorporates by reference the allegations contained in Paragraphs 1 thru 67 as if fully stated herein.

69. Dr. Tippler, as an agent and officer of CMC and AMG, had no right to inquire on multiple occasions about whether or not Dr. Ali was seeing a psychiatrist. He also had no right to demand that Dr. Ali waive privilege with his psychiatrist by signing a release form to allow Dr. Tippler, or anyone else, to view Dr. Ali's files.

70. Such an intrusion into Dr. Al's privacy was of a nature that would be considered highly offensive to a reasonable person, especially of such a private matter as communications with one's psychiatrist.

71. There was no basis for Dr. Tippler to make this demand of Dr. Ali.

72. Upon information and belief, Dr. Tippler shared with other members of the leadership of CMC and AMG that Dr. Ali, in fact, was seeing a psychiatrist.

73. Upon information and belief, Dr. Ali's refusal to sign the consent forms to allow the release of his medical records served as a basis for the decision to terminate Dr. Ali.

74. Dr. Tippler's actions between June 30 and July 9, 2011 constituted an invasion of privacy.

75. As a result of this invasion of the Dr. Ali's right to privacy, Dr. Ali is entitled to compensatory damages in an amount to be determined at trial.

76. Dr. Ali also is entitled to a reasonable amount of attorney's fees.

77. If the refusal to sign the release served as one of the bases for the termination of Dr. Ali, then Dr. Ali is entitled to equitable relief and/or restraining order against CMC and AMG to bar his termination.

## FOURTH CAUSE OF ACTION
(Retaliation)

78. Dr. Ali incorporates by reference the allegations contained in Paragraphs 1 thru 77 as if fully stated herein.

79. Dr. Ali had a protected right to complain about the workplace conditions at CMC and AMG.

80. Dr. Ali also had a protected right to complain about how patients were treated and medical care provided while he was employed by CMC and AMG.

81. Dr. Ali did complain about the workplace conditions at CMC and AMG, as well as the medical care provided, in his December 20, 2010 meeting with Drs. Griger and Tippler.

82. Because of his complaints, Dr. Ali was terminated.

83. Dr. Ali's termination was related in whole or in part to his workplace complaints.

84. As a result of Dr. Ali's complaints, CMC and AMG retaliated against him.

85. Dr. Ali is entitled to damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Defamation)

86. Dr. Ali incorporates by reference the allegations contained in Paragraphs 1 thru 85 as if fully stated herein.

87. Members of CMC and AMG's staff and management made statement(s) to the family of Patient A that Dr. Ali's tube was inserted wrong.

88. Upon information and belief, statements also were made to Dr. Ali's patients at the time he was suspended. Dr. Ali was not allowed to see his patients, even though his privileges had not been revoked.

89. These same members of CMC and AMG's staff and management also requested that Acute Care, Inc. not put Dr. Ali on Acute Care's roster to see patients.

90. These were false statement(s) of fact, and they were not made to Dr. Ali.

91. The statement(s) clearly concerned Dr. Ali.

92. The statement(s) harmed Dr. Ali's reputation in the community and amongst his peers.

93. Dr. Ali is not a "public figure".

15
Case 1:13-cv-00766-WCG   Filed 07/09/13   Page 15 of 16   Document 1

**WHEREFORE** Dr. Ali demands judgment against Affinity, CMC and AMG in amount to be determined at trial. Dr. Ali further seeks:

1. Monetary and compensatory damages in an amount to be determined at trial;

2. His attorney's fees for the invasion of his privacy by Dr. Tippler;

3. Reinstatement to his former position as an employee at CMC and AMG, as well as back pay, benefits and punitive damages;

4. For the costs, disbursements and attorneys fees incurred by Ali in prosecuting each of the claims alleged in this action; and,

5. For such other further relief as the Court deems just and proper.

Dated this 9th day of July, 2012.

                        **CADE LAW LLC**

                        BY: s/NATHANIEL CADE, JR.
                        Nathaniel Cade, Jr., SBN 1028115
                        P.O. Box 170887
                        Milwaukee, WI 53217
                        (414) 255-3802 (o)
                        (414) 255-3804 (f)
                        nate@cade-law.com

                        Attorneys for Plaintiff, Zulfiqar Ali, M.D.

**PLAINTIFF HEREBY DEMANDS A JURY OF 12 PERSONS**