UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ZULFIQAR ALI, M.D.,

        Plaintiff,

v.                                                  Case No. 13-C-0766

CALUMET MEDICAL CENTER, INC.,
AFFINITY HEALTH SYSTEM and
AFFINITY MEDICAL GROUP,

        Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

The Plaintiff, Dr. Zulfiqar Ali, filed this action against Defendants after he was terminated from his employment by Network Health System, Inc., d/b/a Affinity Medical Group (AMG). Plaintiff alleges that his termination was racially motivated, and he asserts claims for intentional discrimination and retaliation under 42 U.S.C. § 1981, as well as supplemental claims under Wisconsin law for defamation, invasion of privacy, and breach of his physician employment agreement. The case is presently before the court on a motion to dismiss filed by Defendants. Defendants contend that Plaintiff fails to state a claim for which relief may be granted under Fed. R. Civ. P. 12(b)(6) and moves to dismiss all five claims. Plaintiff does not oppose dismissal of his claims for retaliation and defamation. As to the remaining claims, however, Plaintiff argues that the complaint is sufficient and Defendants' motion should be denied. For the reasons stated herein, the motion to dismiss will be granted in part and denied in part. The relevant facts as alleged in the complaint are set forth below.

## BACKGROUND

The Plaintiff is a Pakistani national who is licensed as a medical doctor in the State of Wisconsin. (Compl. ¶ 2, ECF No. 1.) AMG is a network of primary and specialty care physicians that provide health care services at facilities owned and operated by Affinity Health System. (*Id.* ¶¶ 4-5.) One such facility is Calumet Medical Center, Inc. (CMC), a hospital located in Chilton, Wisconsin. (Def's Br. in Supp. of Mot. to Dismiss at 3, ECF No. 6.) Plaintiff began working at CMC on or about October 1, 2009 as an employee of Acute Care, Inc. (Compl. ¶ 9.) On or about August 20, 2010, AMG contracted with Plaintiff to provide patient services at CMC and Calumet Medical Center Clinic, which is located on CMC's main campus. (*Id.* ¶¶ 3, 5 & 8.)

Plaintiff was the emergency room physician on duty at CMC on the evening of March 19, 2011 when an injured motor vehicle driver was brought into the emergency room. After Plaintiff intubated the patient, ambulance technician Mark Price complained that Plaintiff had intubated the patient incorrectly. Plaintiff contends that contrary to Price's assertion, x-rays verified that Plaintiff correctly intubated the patient. (*Id.* ¶¶ 9-13.) Price intubated the patient a second time without removing the first tube Plaintiff had used, and 10 minutes after Price performed the second intubation, the patient "coded" and was transferred to a higher level of care via helicopter. The patient died shortly thereafter. Plaintiff claims that he informed the CMC leadership of the second intubation but the leadership did not take any immediate action. (*Id.* ¶¶ 14-18.) Plaintiff was removed from the emergency room roster on April 23, 2011, and Plaintiff contends that he was also not allowed to see his own patients that were admitted to the floor, even though CMC and AMG had not yet completed their investigation of the intubation incident. (*Id.* ¶¶ 19.) CMC convened a Preliminary Review Committee (PRC) to investigate the cause of the patient's death and determine if any provider was at fault, and on or about

2

July 7, 2011, Plaintiff was informed that his actions would be considered at a PRC meeting scheduled for July 19, 2011. (*Id.* ¶¶ 20-21.) AMG provided Plaintiff with a written notice of termination on July 11, 2011. (*Id.* ¶¶ 22, 65.) Plaintiff attended the July 19, 2011 meeting and subsequently received a letter indicating that the PRC would not take any action against him. (*Id.* ¶ 26.)

Plaintiff alleges that he was treated differently than similarly situated white employees while employed by AMG. Specifically, Plaintiff contends that upon joining the AMG staff, he received $20,000 for loan forgiveness and a $10,000 signing bonus and was told by Dr. Chastain that he was being given the maximum amount allowed by AMG policy. (*Id.* ¶¶ 27-28.) Plaintiff claims he subsequently learned that other white medical providers at AMG received $100,000 for loan forgiveness and a $50,000 signing bonus. (*Id.* ¶ 29.) In addition, Plaintiff alleges that he was required to work four and one-half days of "office hours" per week in addition to his inpatient and call work, while other white providers were only required to work four full days. (*Id.* ¶ 30.)

Plaintiff also contends that he was terminated in part for making complaints to leadership, and that other white providers were not terminated for making complaints. (*Id.* ¶ 59.) Plaintiff alleges that between August and December 2010, he complained to Affinity, AMG, and CMC leadership about perceived dangerous and unfair conditions at CMC. (*Id.* ¶ 42.) For example, he contends he criticized the Defendants' practice model called "Medical Home" which had the effect of causing Plaintiff to receive what he viewed as an excessive number of patients. (*Id.* ¶¶ 34-35.) He asserts the referrals caused his schedule to be "completely booked," and that this practice model diverted patients to the outpatient clinic instead of to the hospital's emergency room. Plaintiff felt this practice "was very dangerous" and caused an inefficient use of staff medical assistants. (*Id.* ¶ 36-37.) Plaintiff also allegedly reported problems to leadership about tampering with Boy Scout Chaperone medical records

3

(*Id.* ¶¶ 39-40) and drug discrepancies between a local pharmacy and a nursing home allegedly owned by Affinity in Chilton. (*Id.* ¶ 41.) According to Plaintiff, he had at least one meeting with AMG leadership in December 2010 regarding these issues, and though he periodically inquired whether these issues had been resolved (*Id.* ¶¶ 42-45), none of the "grievances had been taken care of." (*Id.* ¶¶ 45-46).

Finally, Plaintiff asserts that following the patient's death, he experienced a need for additional visits with his personal psychiatrist, and between June 30, 2011, and July 9, 2011, a member of AMG's physician leadership team offended him by "constant harassment and inquiry into [his] relationship with his own psychiatrist." (*Id.* ¶¶ 47, 54 & 55.) Specifically, Plaintiff contends that Dr. Tipler inquired about the name of Plaintiff's personal psychiatrist and told Plaintiff that he must either direct his psychiatrist to forward his psychiatric records to CMC or submit to evaluation by a CMC psychiatrist. (*Id.* ¶¶ 50, 52.)

Plaintiff filed suit on July 9, 2013 asserting claims for intentional discrimination and retaliation under 42 U.S.C. § 1981, as well as supplemental claims under Wisconsin law for defamation, invasion of privacy, and breach of his physician employment agreement. (ECF No. 1.) Defendants' filed their motion to dismiss on August 2, 2013, (ECF No. 5.) and briefing was completed on September 6, 2013. In response to Defendants' motion, Plaintiff requested that his retaliation and defamation claims be dismissed without prejudice. (Pl's Resp. to Defs' Mot. to Dismiss at 11-2, ECF No. 10) The remaining claims will be analyzed below.

**ANALYSIS**

In considering a motion to dismiss, the court construes the allegations in the complaint in the light most favorable to the plaintiff, accepts all well-pleaded facts as true, and draws all inferences in

4

favor of the non-moving party. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). The court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts and his statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.*" Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). "[T]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

**1. § 1981 Claim**

Defendants contend that Plaintiff's complaint consists of bare legal conclusions which lack sufficient evidentiary support to meet the "plausibility" standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To support this contention, Defendants appear to argue that

5

*Twombly* and *Iqbal* significantly heightened the pleading standard for Title VII and § 1981 race discrimination claims. Defendants also assert that Plaintiff's complaint is deficient because it does not contain facts that satisfy the *McDonnell Douglas* standard for indirect proof claims, which requires a plaintiff to prove that 1) he was a member of a protected class; 2) he was meeting his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) similarly situated employees outside the protected class were treated more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Defendants overstate Plaintiff's burden at the pleading stage of the litigation. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002), held that a plaintiff is not required to plead facts that establish a prima facie case under the *McDonnell Douglas* framework. *Swierkiewicz* was cited with approval in *Twombly*, *see* 550 U.S. at 569-70, and the Seventh Circuit has affirmed that a discrimination claim survives a motion to dismiss if it identifies the type of discrimination suffered, the person allegedly responsible for the discrimination, and the time at which the discrimination occurred. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (denying motion to dismiss because plaintiff's complaint identified the type of discrimination alleged (racial), by whom (Citibank's manager), and when (in connection with plaintiff's effort in early 2009 to obtain a home-equity loan)); *see also Reynolds v. AAA Auto Club Enterprises*, No. 13-1280, 2013 WL 2254577, at *2 (7th Cir. May 23, 2013) (observing that under *Swierkiewicz*, "a conclusory complaint of employment discrimination is adequate").

Here, the complaint exceeds even this standard. Plaintiff alleges that he suffered discrimination on the basis of his race, he identifies several decisionmakers at CMC and AMG as the individuals who allegedly discriminated against him, and he identifies several instances in which the decisionmakers

6

allegedly treated him differently than his white peers. For example, he alleges that AMG paid him a $10,000 signing bonus but paid $50,000 to other white medical providers. (Compl. ¶¶ 27-29.) He also alleges that he was required to work four-and-a-half days per week as his office hours, whereas white medical providers only had to work four days per week. (*Id.* ¶ 30.) His central claim is that he was terminated for complaining about various issues whereas white providers who complained were not terminated. (*Id.* ¶ 59.) The allegation that Plaintiff was treated differently than "white medical providers" in pay and other conditions of employment, at least at the pleading stage, is sufficient. Plaintiff's allegations are not "thread-bare" or devoid of factual content, and they thus satisfy the Seventh Circuit's pleading standard in discrimination cases. Therefore, Plaintiff has satisfied his burden at the pleading stage and his § 1981 claim will be allowed to proceed.

**2. Breach of Contract**

Plaintiff's claim for breach of contract arises from his assertions that he had a contract with AMG to provide physician services, the contract was breached by AMG on or about July 11, 2011 when Plaintiff was terminated, and AMG breached the contract by terminating Plaintiff after he complained about procedures and practices at CMC and AMG. (Compl. ¶¶ 63-66.) To state a claim for breach of contract under Wisconsin law, a plaintiff must, at a minimum, "specifically allege the provision of the contract at issue and its breach by the defendant." *St. Francis Sav. & Loan Assoc. v. Hearthside Homes, Inc.*, 221 N.W.2d 840, 843 (Wis. 1974). Defendants contend that Plaintiff's complaint fails to identify any specific contract provision that has been breached. Defendants have also provided a copy of Plaintiff's employment contract with AMG, which states that termination may be based on 90 days' prior written notice or material breach. (*See* Physician Employment Agreement at 6-7, Exh. A, ECF No. 7.)

7

While the Complaint does not use the words "material breach," the facts alleged are sufficient to raise the inference that the reason Plaintiff was allegedly fired—complaining about procedures and practices—was not a sufficient basis to terminate his contract, and it provides examples of the complaints he made to leadership at Affinity, CMC, and AMG. (*See* Compl. ¶¶ 31-43.) It also appears Plaintiff was not provided the required ninety days notice. These allegations sufficiently communicate to Defendants the factual bases of Plaintiff's breach of contract claim. Therefore, Plaintiff has alleged sufficient facts to state a claim for breach of contract against Defendants.

**3. Invasion of Privacy**

Under Wisconsin law, a plaintiff may establish a claim for invasion of privacy by establishing 1) an intrusion on an individual's privacy in a way that would be "highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a way that would be actionable for trespass," WIS. STAT. § 995.50(2)(a); 2) the use of plaintiff's name or likeness, without consent, for "advertising purposes or purposes of trade," § 995.50(2)(b); or 3) the publicity of a matter concerning the private life of another that is highly offensive to a reasonable person, § 995.50(2)(c). Although Plaintiff's complaint does not identify which subsection cited above he believes Defendants have breached, Plaintiff's response brief clarifies that he asserts a claim under § 995.50(2)(a).

Defendants contend that Dr. Tipler's alleged harassment of Plaintiff concerning Plaintiff's psychiatric records fails to state a claim as a matter of law because Plaintiff has identified no geographical "place" upon which Defendants have intruded. Defendants cite *Hillman v. Columbia Cnty.*, 164 Wis. 2d 376, 392 (Ct. App. 1991), which held that the meaning of the word "place" in subsection (a) is geographical and does not include a medical file. Defendants argue that since intrusion upon a medical file is not actionable under subsection (a), neither is asking another individual

8

about his medical treatment. Plaintiff argues in response that the Wisconsin Supreme Court has declined to determine whether a person's private belongings or private concerns, which also exist geographically in a "place," may be actionable under subsection (a), citing *Fischer v. Mt. Olive Lutheran Church, Inc.*, 207 F.Supp.2d 914, 928 (W.D. Wis. 2002). In *Fischer*, the court observed although *Hillman* defined "place" for purposes of subsection (a) to be a geographical location, *Hillman* did not decide whether an intrusion can be perpetrated on a person's belongings or private concerns, which also exist geographically "in a place." 207 F. Supp. 2d at 928. The court in *Fischer* held that an email account may constitute an actionable "place" for purposes of subsection (a), reasoning that under evolving standards of privacy, such an intrusion may be "highly offensive to a reasonable person." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 625B cmt. b ("intrusion on privacy of another 'may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit inspection of his personal documents'")).

      Plaintiff correctly asserts that the Wisconsin Supreme Court has not limited the definition of "place" in subsection (a) to a physical geographic location, but Plaintiff's claim is still distinguishable from the kind of "private concerns" discussed in *Fischer*. The defendants in *Fischer* were alleged to have accessed the plaintiff's email accounts without his permission. 207 F. Supp. 2d at 927. Here, Plaintiff has merely alleged that Dr. Tipler asked him to disclose confidential information. Thus, any information Dr. Tipler received about Plaintiff's psychiatrist came directly from Plaintiff, and not from Defendants' intrusion upon a physical "place" like an email account. This court finds that the mere act of requesting information from another individual cannot reasonably be construed as intrusion upon

9

a private "place."  Plaintiff's invasion of privacy claim under § 995.50(2)(a) therefore fails as a matter of law.

Additionally, plaintiff appears to have abandoned his initial contention that Dr. Tipler "shared with other members of the leadership of CMC and AMG that Dr. Ali, in fact, was seeing a psychiatrist." (Compl. ¶ 72.)  In his response brief, Plaintiff acknowledges that he does not know what Dr. Tippler did with the information that Plaintiff was seeing a psychiatrist.  (*See* Pl's Br. in Resp. to Def's Mot. to Dismiss at 12, posing hypothetical questions, *e.g.*, "Did he disseminate [the information] to other members of the staff?")  Such speculation is insufficient to establish a claim under any subsection of § 995.50(2).

**4. Dismissal of Affinity Health System**

Defendants also request that Affinity Health System be dismissed from this action, asserting that Plaintiff has failed to state a claim against the company.  Plaintiff's employment contract was with Network Health Systems, d/b/a Affinity Medical Group.  (Decl. of Timothy W. Feeley, Ex. A.)  Plaintiff has not responded to this argument, and Defendants' request will therefore be granted.  Plaintiff may wish to amend to name Network Health Systems and the proper defendants.

## CONCLUSION

Based on the foregoing reasons, Defendants' motion to dismiss (ECF No. 5) the complaint pursuant to Rule 12(b)(6) for failure to state a claim is **DENIED** as to Plaintiff's § 1981 claim and breach of contract claim.  Defendants' motion to dismiss Plaintiff's invasion of privacy, defamation, and retaliation claims is **GRANTED**.  In addition, Affinity Health System is dismissed as a defendant

10

Case 1:13-cv-00766-WCG   Filed 09/23/13   Page 10 of 11   Document 13

in this action. Unless Plaintiff elects to file an amended complaint, Defendants shall file an answer within 14 days. The Clerk may set the matter on the Court's calendar for scheduling at this time.

**SO ORDERED** this   23rd   day of September, 2013.

                                             s/ William C. Griesbach
                                             William C. Griesbach, Chief Judge
                                             United States District Court